## M. B. HERTZKA v. HOBART S. ELLISON.

Middle Section.   September 26, 1928.

No petition for Certiorari was filed.

668

Levine & Levine, of Nashville, for plaintiff in error.

C. H. Rutherford and W. H. Washington, of Nashville, for defendant in error.

FAW, P. J. This is an action for false imprisonment brought by Hobart S. Ellison against M. B. Hertzka and J. L. Foster. The plaintiff's declaration contained three counts. Through the first and second counts the plaintiff sued the defendants for an alleged malicious prosecution, and through the third count for false imprisonment. The undisputed proof showed that the plaintiff was arrested and imprisoned without a valid warrant and without legal commitment and the trial judge properly held that there was no evidence to support the counts for malicious prosecution.

At the close of all the evidence the trial judge peremptorily directed the jury to return a verdict against both defendants for false imprisonment, and submitted the case to the jury for an assessment of damages. The jury returned a verdict for plaintiff against defendant Hertzka for $2500 and against defendant Foster for $500, and judgment was rendered accordingly; but, following the practice approved in Nashville Railway & Light Co. v. Trawick, 118 Tenn., 273, 99 S. W., 695, the verdict as to defendant Foster was, on motion of the plaintiff, set aside, and the plaintiff was permitted to enter a nolle prosequi as to Foster. A motion for a new trial on behalf of defendant Hertzka was overruled and he thereupon appealed in error to this court and has filed twenty-six assignments of error here, which correspond to the several grounds of his motion for a new trial in the circuit court.

We are of the opinion that the eighth, tenth and eleventh assignments of error, through which the plaintiff in error Hertzka (hereinafter called defendant) complains of the action of the trial court in peremptorily directing the jury to return a verdict against him, and the twenty-second assignment of error, through which he complains of the refusal of the court to give in charge to the jury his special request No. 1, must be sustained,

Defendant Hertzka's special request No. 1, mentioned above, was as follows: "Gentlemen of the Jury: If you find that the defend-

ant Hertzka simply procured the officers that they might investigate the circumstances, and that he did not order the arrest, nor did he tell the officers to arrest the plaintiff; then your verdict should be for the defendant Hertzka.''

The learned trial judge charged the jury as follows:

"Malicious prosecution is in procuring an arrest or prosecution under a warrant or a lawful process, under the forms of the law, but from malicious motives and without reasonable or probable cause.

"Now, in this case, gentlemen of the jury, there could not be malicious prosecution. The reason for this is, no warrant was taken out. For you can only have malicious prosecution where a warrant or some lawful process has been issued and that process, of course, must be issued by some magistrate, as I have previously explained to you. So, we haven't that in this case. So, it cannot be an action for malicious prosecution.

"We next come to the question as to whether or not there is an action for false imprisonment. False imprisonment, gentlemen of the jury, is an arrest or imprisonment in which there has been an arrest or some interference with the liberty of a person, which is unlawful and without authority.

"Now, I have previously explained to you, under what circumstances a man can be arrested and who can make that arrest. Now, under the unquestioned proof in this case, there was no warrant issued for the arrest of the plaintiff. The alleged offense, if there had been an offense even, was not committed in the presence of the officer. So, of course, the officer had no right, he had no authority to make the arrest in question; and even if he had had the right and authority to make an arrest under any circumstances, without a warrant, it then became his duty to take the prisoner that he had arrested, before some committing magistrate, and the committing magistrate in this case, of course, would have been the city judge. But, there is no pretense even that that was done. He was simply locked up on the order of, in so far as this record is concerned, by the direction and authority of some police officer, Mr. Bracey, I reckon, but I don't know.

"Now, gentlemen, there is no question but what this man, the plaintiff in this case, was unlawfully deprived of his liberty. So, I direct you to return a verdict in this case against both defendants for false imprisonment. Now, that would apply to Mr. Hertzka, because if a person sets in motion by his acts or words the machinery from which another is wronged, that person who does so is equally answerable with the person who commits the wrong. So, in this case, unquestionably, Mr.

Hertzka is the man who sets the machinery in motion, out of which grew the arrest and the incarceration of the plaintiff in this case.''

We have quoted only a part of the charge, but the remainder does not limit or qualify the part quoted.

There was evidence in the record that defendant Hertzka did not command, direct, advise or request the arrest and imprisonment of plaintiff Ellison. ''There can be no constitutional exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried, but the case must go to the jury.'' Hines v. Partridge, 144 Tenn., 219, 232. 231 S. W., 16.

The proof shows that J. A. Ogilvie, shipping clerk in the employ of Derryberry & Company, wholesale produce dealers in Nashville, gave plaintiff Ellison some potatoes in the afternoon of Saturday, January 8, 1927. Plaintiff had, on that and the day immediately preceding. been unloading potatoes from railroad cars for Derryberry & Company under the supervision of Ogilvie. Plaintiff procured a negro man who had been working with him to assist him in putting the potatoes in two sacks and in carrying them to the market house on the public square in Nashville. Plaintiff and the negro—each carrying a sack of potatoes—entered the market house about five o'clock on the Saturday afternoon mentioned, and plaintiff there and then undertook to find a purchaser for the potatoes.

Defendant Hertzka was at that time, and had been for several years theretofore, a produce dealer in connection with the firm of E. S. Hertzka & Company. J. L. Foster, defendant below, was at that time a detective of the police department of the City of Nashville.

Plaintiff undertook to sell the potatoes to defendant Hertzka, and Hertzka, believing that plaintiff had made an untruthful statement to him as to where he got the potatoes, went in search of a policeman and found Foster near the market house. As a result of Hertzka's representations to him, Foster went in the market house and talked with plaintiff and then took plaintiff, under arrest, to the Police Station, where plaintiff was registered on a charge of ''vagrancy,'' and was locked in a cell until Sunday afternoon—about twenty-four hours—when he was released on a ''cash bail'' of twenty-five dollars furnished by his mother. On the following day. Monday, January 10th, plaintiff appeared before the City Police Court and was discharged without trial, upon the presentation to the court of a letter from J. A. Ogilvie stating that he (Ogilvie) had given the potatoes to plaintiff.

The substance of plaintiff's version of the occurrences at the market house with which he connects Hertzka appears from the following excerpts from plaintiff's testimony before the jury:

"Q. When you put down the potatoes at this stall, you say that Mr. Hertzka wasn't there, at that time? A. I couldn't say positive that he was at the stall or was not at the stall; if he was there, I didn't see him at that time, at the time we entered the Market House.

"Q. After you put them down, what did you do? A. I told the negro to stay there with them and I would go down through the Market House and see if I could find any one down there that would handle them. When I came back, Mr. Hertzka was talking to this negro. . .. .

"Q. Just tell what passed, after you got up there, did you offer to sell the potatoes to Hertzka? A. No, sir, I didn't have a chance to offer to sell them to him. When I came back up there he asked me where the potatoes was raised. I told him I guessed they was raised in the State of Tennessee, I wasn't positive, where they was raised, as a fact, I didn't know. He picked up one of the potatoes out of the bag, and broke it open, and he says, those potatoes wasn't raised in the State of Tennessee, they are northern potatoes. Well, I says, as for that fact, I don't know where they was raised, but I have got them here for sale. And he asked me where did I get the potatoes. Well, I didn't figure that was any of his business where I had gotten the potatoes, so therefore, I didn't tell him. So he says, I am going out and employ an officer and find out where you. got those potatoes. I says, all right, go ahead, I says, I will wait right here until you come back. Because I knew I had come by the potatoes honest, so I wasn't scared of how many officers he got and brought in there.

"Q. When he went off, what did he say he was going to do? A. He said he was going out and get an officer and find out where I got those potatoes.

"Q. Whom did he get? A. He got Detective Foster and Lonnie Martin, traffic officer came in with them. I don't know which officer he got first, but they both came back with Mr. Hertzka.

"Q. Which is Foster? A. This gentleman right here with the glasses, sir.

"Q. And which is Hertzka? A. The gentlman sitting next to him.

"Q. Well, when—how long was he gone after Foster? A. Well, I couldn't say the exact minute, it wasn't over five, well, five minutes, I will say.

"Q. He said he was going to find out where you got those potatoes? A. He said he was going to get an officer to find out where I got those potatoes.

"Q. Well, was the negro still there? A. No, sir, when he went out—

"Q. I say, was the negro there when he said he was going to get an officer? A. The negro was there when he started after the officer, yes, sir.

"Q. What become of the negro then? A. When he started out to get an officer, this negro left.

"Q. Which way did he go? A. He went down through the Market House.

"Q. What made him go, you didn't tell him to go? A. No, sir, I didn't tell him to go.

"Q. When he came back who was with him—you say these two officers? A. Detective Foster and Lonnie Martin.

"Q. Did Foster ask you where you got the potatoes? A. Foster came in and he asked me where I got the potatoes, and I told Foster that I got the potatoes—was working at a wholesale house down on Second avenue, I was employed on First avenue, I hadn't never learned the name of the wholesale house, in fact I never had been around in front of the building to find out the name, but I told him that the shipping department manager's name was J. A. Ogilvie, I says, and if you don't believe that, I come by these potatoes honest, I says, you can either go down with me to see J. A. Ogilvie, or step to the telephone and call him up. When I told him that, Hertzka, he put in and says, I don't believe any man would give that many potatoes to him, he says, I would advise you to place him under arrest and find out where he got them. Mr. Detective Foster told me, when he left the Market House . . .

"Q. Before we get to that. When Hertzka said that, had you already told Foster that you got them, that a man named Ogilvie gave you the potatoes? A. Yes, sir.

"Q. Well, did Foster hear that? A. Yes, sir, Foster heard it. Foster was the man I was talking to.

"Q. What did Foster say when you mentioned the name of Ogilvie, I mean, not Foster, but Hertzka? A. When I mentioned the name of Hertzka?

"Q. I say, when you mentioned the name of Ogilvie, and told Foster that Ogilvie had given you the potatoes, but that

you didn't know what house he was employed at, that it was on Second avenue, did Hertzka hear you say that Ogilvie gave you the potatoes? A. Yes, sir, he heard the conversation.

"Q. What did he say about Ogilvie, if anything? A. He admitted to the fact that he knew a man by that name that worked there.

"Q. Did he say—repeat the words, as near as you can? A. He says, I know a man by that name, who works down on Second avenue, he says, Shipping Department Manager of Derryberry & Company.

"Q. Which one said that he knew a man by the name of Ogilvie that worked down there? A. Mr. Hertzka.

"Q. Did Mr. Foster hear that? A. Yes, sir. . . .

"Q. What did you say when he said that they were not raised in Tennessee A. Well,—

"Q. (Continuing). But were Northern or Kentucky potatoes? A. Well, I told him, I says, I don't know as it makes any difference where the potatoes was raised, I said, I have got them here for sale, and if you want to buy them, that is your privilege, I says, if you don't, you don't have to.

"Q. Well, did you say that in a calm way, or were you nettled by his, by what he said? A. I was offended by what Mr. Hertzka had already said to me, because it looked to me like he was trying to claim that I had stole the potatoes. That is the exact words, I says to him, I says, Mr. Hertzka, I says, I have got the potatoes here for sale, what if they wasn't raised in Tennessee, what difference does it make where they was raised, I have got them there for sale, if you want to buy them, you can buy them, I says, if you don't want to buy them, you can keep your damn hands off of them that is the exact words I said to him.

"Q. Was that said before he went for Foster? A. Yes, sir.

"Q. That was before he went for Foster? A. Yes, sir, that was before he went after Foster."

If the foregoing testimony of plaintiff, including his statement that Hertzka said to Foster that he would advise him (Foster) to place plaintiff under arrest, had been uncontradicted, we are inclined to the opinion that peremptory instructions for plaintiff against Hertzka would have been proper; but we are not called upon to determine that question, as there was much evidence before the jury in conflict with plaintiff's statement that Hertzka advised Foster to arrest plaintiff.

674

It is shown by plaintiff's witness Ogilvie that the potatoes he gave plaintiff were "northern potatoes;" that there is "quite a difference between northern potatoes and Tennessee-grown potatoes," and that one accustomed to handling and dealing in potatoes can "tell the difference . . . by looking at them." Defendant Hertzka testified that he could easily distinguish a northern potato from a Tennessee potato by looking at them. The testimony of Ogilvie and defendant Hertzka just mentioned is undisputed.

There is evidence in the record that defendant Hertzka merely reported the facts to the officers in order that they might investigate the matter of plaintiff's possession of the potatoes, and that he did not direct, request or suggest that they (Foster or Martin) arrest plaintiff, and pursued the matter no further after he had informed the officers of what had occurred in the market house, and did not know that plaintiff had been arrested until after plaintiff had been released from the Station House. According to the testimony of defendant Hertzka and his witnesses, he made a truthful and fair statement to the officers of the circumstances which had aroused his suspicions.

"The fact that the officer acted wrongfully in making the arrest does not absolve the person who instigated the arrest. What is a direction or request sufficient to impose liability within the meaning of this rule depends on the facts of each case, and may be inferred from circumstances as well as established by direct proof. It is not essential that the party directing the arrest be present at the time of the arrest. It should appear, however, that the arrest was made pursuant to his direction or request." 25 Corpus Juris, p. 470.

Merely furnishing the arresting officer with the facts will not render one liable. Cooley on Torts, 2nd Ed., p. 217.

If the testimony of defendant Hertzka and his witnesses contained the truth of the case, the circumstances (which were created in large measure by plaintiff's wilful misrepresentation of the facts) were sufficient to generate a strong suspicion in the mind of an ordinarily prudent person that plaintiff had not acquired possession of the potatoes honestly. Whether the plaintiff on the one hand or defendant Hertzka and his witnesses on the other hand had told the truth about the matter was for the jury, and not the court, to determine.

One cannot be held liable for a false imprisonment where he merely informed an officer of circumstances which had aroused his suspicions, but made no request or suggestion that the suspected person be arrested, and the officer, of his own volition, made an arrest. Miller v. Fano, 134 Calif. 103, 106; Joske v. Irvine, 91 Texas, 574, 583; Rich v. McInery, 103 Ala. 345, 357; Allen v. Lopin-

sky, 81 West Va., 13, 16; Lemmon v. King, 95 Kansas, 524, 148 Pac., 750, L. R. A. 1915-E, 882. See also Note in L. R. A. 1915-E, p. 885, for other cases cited in support of this principle.

In their brief, learned counsel for plaintiff rely upon the opinion in Eichengreen v. Railroad, 96 Tenn., 229, (34 S. W., 219), as authority for the direction of a verdict in this case, and the phraseology of the court's charge (the use of the phrase "sets the machinery in motion") suggests that the trial judge had that opinion in mind, as a controlling authority, when he directed a verdict for plaintiff.

"The generality of the language used in an opinion is always to be restricted to the case before the court, and it is only authority to that extent. The reasoning, illustrations, or references contained in the opinion of a court are not authority, not precedent, but only the points in judgment arising in the particular case before the court." L. & N. R. Co. v. County Court, etc., 1 Sneed, 637, 635. See also Clark v. Lary, 3 Sneed, 77, 80; Henley v. State, 88 Tenn., 665, 737.

In Cohens v. Virginia, 6 Wheat. (U. S.) 399,—5 L. Ed. 257, —the court, speaking through Chief Justice Marshall, said: "It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other principles which may seem to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." See also opinion of the U. S. Circuit Court of Appeals by Judge Lurton in the case of Southern Railway Co. v. Simpson, 131 Fed., 705, 709.

In Eichengreen's case, Stewart, the agent of the Railway Company, sent a telegram from Bowling Green to the telegraph operator at Gallatin, as follows:

"Tell your police authorities to meet me at depot. A man on train with counterfeit money going to get off at your station. Tried to pass five dollars of it at Bowling Green.

"(Signed) W. J. Stewart."

There was evidence to the effect that, in response to the foregoing telegram, a policeman met the train indicated, and the conductor of the train pointed out Eichengreen and he was arrested by the policeman. About that time Stewart, the railroad detective who

had sent the telegram, came up and, pointing to Newmark, the companion of Eichengreen, said to the policeman:

"Why have you not arrested the other one; there are two of them," and, the policeman thereupon arrested Newmark also.

It is seen that the telegram sent by Stewart was a representation that a felony had been committed and that the man that had committed the felony was on the train and was going to get off at Gallatin, and that Stewart wanted the "police authorities" of Gallatin to meet him (Stewart) at the depot. Moreover, when the train arrived at Gallatin, Stewart not only identified the "man" to whom his message referred, but manifested, by words and conduct, his desire and purpose that not only Eichengreen but his companion, Newmark, be arrested, although he did not "expressly" order or direct that the arrest be made. Although it was necessary, in order to fix liability on Stewart's principal, the Railroad Company, that it should appear that the arrest had been made pursuant to Stewart's direction or request, the fact, as to whether Stewart had directed or requested that Eichengreen be arrested, could be "inferred from the circumstances as well as established by direct proof." (See quotation from 25 Corpus Juris, p. 470, supra.)

That part of the opinion in Eichengreen's case bearing upon the question here under discussion is as follows:

"Assignments of error are also made upon certain instructions given the jury at the request of defendant's counsel. The first instructions was, viz: 'If Stewart simply telegraphed the operator to notify the police that a man was on train who had passed, or attempted to pass, counterfeit money, then that would not authorize the police to arrest him, unless he was directed to do so by an agent who had authority to act in such a matter.' This instruction, in the opinion of the court, was misleading, since it does not give the entire import of the telegram. The message from Stewart, it will be remembered, begins, viz: 'Tell your police authorities to meet me at the depot,' and there was evidence tending to show that, upon the arrival of the train, Stewart and the conductor pointed out the two suspects to the policeman. Again, the instruction is erroneous, in that the liability of the company for the arrest is made to depend upon the order or direction of the agent, when the company would be equally liable if the agent procured the arrest, or set in motion the machinery by which the arrest was made, although not expressly ordering or directing it.

"For the same reason we think the following instruction, submitted to the jury at the request of defendant's counsel,

was also misleading, to-wit: 'If W. J. Stewart was ordered by his employer to not arrest parties, but to report the same to the railroad authorities, unless in an urgent case of wrong to the company, and if Eichengreen simply offered to pass a counterfeit bill at Bowling Green, then, unless said Stewart ordered his arrest or swore out a warrant against the plaintiff, the defendant would not be liable in this case.'

"For the same reason, the ninth request of defendant's counsel should not have been given in charge to the jury. In this latter instruction, the court sets out the telegram sent by Stewart to the operator at Gallatin, and instructs the jury that it would not authorize the plainiff's arrest unless Stewart or some one of defendant's employees ordered it. It is not necessary that the arrest of plaintiff should have been expressly ordered by any agent of the company, but if it appears that it was procured by any agent of the company, acting within the scope of his employment, the company would be liable." (Pages 239-24).

We do not construe the decision of the Supreme Court in Eichengreen's case as opposed to the rule we are applying in the instant case. For the reasons we have stated, defendant Hertzka's eighth, tenth, eleventh and twenty-second assignments of error are sustained.

.The thirteenth assignment is that "the court erred in its entire charge in that it was based upon the theory that the plaintiff was entitled to recovery, and the defendants were, by the undisputed testimony, guilty of such action as entitled the plaintiff to recover damages."

This assignment is not sufficiently specific, and in that respect does not conform to the printed rules of this court governing assignments of error. If good at all, it raises the same legal question as the assignments which have been sustained, supra.

The twenty-fifth assignment is that "the verdict of the jury was so excessive as to show prejudice, passion, malice and caprice on behalf of the jury."

Inasmuch as the case must go back for a new trial, we will pretermit the consideration of this assignment.

We have considered the numerous assignments of error not hereinbefore disposed of, and we are of the opinion that no one of them points out reversible error; hence, they are all overruled. We see no occasion to extend this opinion by copying them herein and discussing them at length.

It results that, for the errors pointed out by the eighth, tenth, eleventh and twenty-second assignments, the judgment of the trial

court against defendant Hertzka is reversed, the verdict is set aside, and the cause will be remanded to the circuit court for a new trial. The costs of the appeal will be adjudged against the plaintiff Ellison. The costs of the trial court will abide the future judgment of that court.

Crownover and DeWitt, JJ., concur.