RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0214p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

JOAN ELIZABETH WESER,

>    *Plaintiff-Appellant*,

*v.*

KIMBERLY GOODSON; LANCE ANDERSON,

>    *Defendants-Appellees*.

No. 20-5178

─────────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:17-cv-00473—J. Ronnie Greer, District Judge.

Argued: June 17, 2020

Decided and Filed: July 15, 2020

Before: GILMAN, KETHLEDGE, and MURPHY, Circuit Judges.

─────────────────

#### COUNSEL

**ARGUED:** Peter Alliman, WHITE, CARSON & ALLIMAN, Madisonville, Tennessee, for Appellant. Dana Pemberton, STOKES, WILLIAM, SHARP, COPE & MANN, Knoxville, Tennessee, for Appellee Goodson. Hilary L. Magacs, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellee Anderson. **ON BRIEF:** Peter Alliman, WHITE, CARSON & ALLIMAN, Madisonville, Tennessee, W. Tyler Weiss, WORTHINGTON & WEISS, Madisonville, Tennessee, for Appellant. Ellis A. Sharp, STOKES, WILLIAM, SHARP, COPE & MANN, Knoxville, Tennessee, for Appellee Goodson. Hilary L. Magacs, Jonathan Swann Taylor, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellee Anderson.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. This case arises from a bizarre set of circumstances involving two women, a deputy sheriff, and a crate full of cats and kittens. Joan Elizabeth Weser and Kimberly Goodson met through their joint work with an animal-rescue organization called Loudon County Friends of Animals (LCFOA). Weser owns a farm in Loudon County, which she allowed the organization to use as a cat-rescue facility. Later, however, after Weser and Goodson had a falling out, LCFOA ceased its operations on Weser's farm.

The women's differences reached their breaking point on November 7, 2016. On that date, 12 of LCFOA's cats and kittens remained on Weser's property, with Weser and Goodson having a disagreement over how the felines should be returned to LCFOA. That evening, Weser put the cats and kittens in a large crate, drove over to Goodson's house, and placed the crate on Goodson's driveway.

Goodson responded by calling Loudon County 911, causing Deputy Sheriff Lance Anderson and another officer to be sent to the scene. Anderson interviewed Goodson and subsequently arrested Weser for criminal trespass, but that charge was later dismissed. Weser then filed this lawsuit against Anderson and Goodson, raising claims under both federal and Tennessee law.

The district court granted summary judgment in favor of Anderson and Goodson on all of Weser's claims. For the reasons set forth below, we **AFFIRM** the district court's judgment in favor of Goodson as to all claims against her. With respect to Anderson, we **AFFIRM** the district court's judgment in his favor as to the federal claims and the state-law claim for malicious prosecution, **VACATE** the district court's judgment in his favor as to the state-law claims for false arrest and false imprisonment, and **REMAND** the case to the district court with instructions to decline to exercise supplemental jurisdiction as to those remaining claims.

## I.  BACKGROUND

LCFOA is a volunteer animal-rescue organization that deals primarily with cats. Goodson is the founder of LCFOA and serves as its president.  Weser volunteered with the organization and served on its board of directors.  The two women became friends through their association with LCFOA.  But the relationship between Weser and Goodson deteriorated rapidly in the fall of 2016.  As a result of this rupture, Weser was removed as a director of LCFOA, and the organization ceased its operations on her farm that October.  Twelve of LCFOA's shelter cats and kittens remained on Weser's property at that time.

On November 3, 2016, Goodson sent a letter by regular mail to Weser on LCFOA stationery.  The letter stated that LCFOA had been attempting to get the rest of the cats and kittens removed from Weser's property.  It went on to say that the organization "need[ed] to be able to get" eight of the cats and kittens "into foster care by Saturday, November 12, 2016.  If you will not release them to us, they will become property of yours after this date and we will mail you the records."  The letter directed Weser to contact Lee Ann Burgett, another LCFOA volunteer, to arrange a time when LCFOA could pick up the cats and kittens.  It stated that "we can pick up these 8 kitties either Monday November 7, Friday November 11 or Saturday, November 12, 2016."  The letter further informed Weser that Goodson would be spending "3 days in Nashville for testing and a bone marrow biopsy next week"—meaning the week of November 7—and that Burgett herself would take the remaining four cats and kittens for foster care.

After Weser saw the letter somewhere between 5:00 p.m. and 6:00 p.m. on November 7, she went out to her farm.  There, she encountered Burgett.  Weser asked if Burgett could take the cats from the property that day.  Burgett responded that she could not.  Weser then told Burgett that she would take the cats to Goodson, to which Burgett replied that Goodson was scheduled to be in Nashville for a medical appointment the following day.

Next, Weser sent Goodson a Facebook message to tell her that the cats and kittens were going to be dropped off at Goodson's house that Monday evening.  Goodson replied at 6:28 p.m.: "Well can't take them now.  Friday or Saturday is the only time.  I will be gone the rest of

the week. We will pick them up Friday or Saturday." Weser responded at 6:45 p.m.: "They are coming now. [I] am not available any other time." Goodson then replied at 6:51 p.m.: "They are yours th[e]n."

Around the time that this exchange was going on, Weser put the cats and kittens in a large crate and left for Goodson's house. Upon arriving, Weser backed her car into Goodson's driveway, lifted the hatch, and offloaded the crate. She placed the crate on the driveway in front of the garage. Weser then sent another Facebook message to Goodson at 7:08 p.m.: "Cats in driveway. Not my problem. Several are sick."

After dropping off the crate, Weser initially drove away, but then circled back to see if the cats and kittens had been taken inside. Goodson, who was home at the time, stated that she saw the crate in front of her garage and claimed that Weser was parked "at the end of our driveway." This caused Goodson to call Loudon County 911 to report what Weser had done. According to the transcript of the 911 call, Goodson also stated that Weser was a "crazy woman," that Weser was "sitting in our driveway" with "a gun in her car," and that Weser was "drunk off her butt."

Anderson and another sheriff's deputy, Craig Brewer, were dispatched to the scene in response to Goodson's call. Goodson told Anderson in an interview that Weser had come into the driveway, dropped off the crate of cats and kittens, and remained on the property in her car. Weser disputes part of this account. According to Weser's version of the events, she did not reenter the driveway after dropping off the crate. Instead, when the officers arrived, she was legally parked on the street.

What conversations, if any, occurred between the officers and Weser is also a matter of dispute. According to the district court, when the officers arrived, Brewer spoke to Weser while Anderson was interviewing Goodson. Weser admitted that she had dropped off the cats and kittens. Brewer asked Weser to leave the area several times, but Weser refused to leave, stating that she would not leave until the cats and kittens were taken inside from the driveway. The district court also recounted that the officers spoke again to Weser after Anderson had interviewed Goodson. They warned Weser that if she did not leave the area, she would be

arrested.  When Weser again refused to leave the area, Anderson placed Weser in custody and arrested her.  For her part, Weser alleges that the officers simply told her that she was under arrest, and there was no further discussion.  She also asserts that she was never given any warnings or opportunities to leave before she was arrested.

Weser was charged with criminal trespass, which is a Class C misdemeanor in Tennessee.  This charge was later dismissed, with the costs taxed to the State.  Weser subsequently filed this lawsuit against both Anderson and Goodson.  She raised federal claims under the Fourth and Fourteenth Amendments, as well as state-law claims for false arrest, false imprisonment, and malicious prosecution.  Both Anderson and Goodson moved for summary judgment, which the district court granted.  Weser then timely filed this notice of appeal.

## II.  ANALYSIS

### A.    Standard of review

We review a district court's grant of summary judgment de novo.  *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.    Fourth Amendment claims

Weser's federal claims in this lawsuit rest on 42 U.S.C. § 1983, which provides a cause of action for a person deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States when the deprivation takes place "under color" of state law.  On appeal, Weser has abandoned her Fourteenth Amendment claim, leaving the Fourth Amendment claim as her only remaining federal claim.

### 1.    Anderson

The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Weser's briefing is not entirely clear on what theories of liability she is alleging with respect to the Fourth Amendment.  The district court understood her federal theories of liability to be the same as her state-law ones; namely, false arrest, false imprisonment, and malicious prosecution.  No party has objected to this approach in their briefing, so we follow this same analysis here.

This court has recognized that claims for false arrest and malicious prosecution are both constitutionally cognizable and both arise under the Fourth Amendment.  *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020).  When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—those claims are identical, so we will simply refer to those two claims together as a false-arrest claim.  *See Corvin v. Bice*, No. 1:05-CV-219, 2007 WL 776501, at *4 (E.D. Tenn. Mar. 9, 2007) (citing *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988)).

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).  Similarly, one of the elements of a federal malicious-prosecution claim—and the most relevant one here—is that a plaintiff must show "that the officers helped start a prosecution against him without probable cause." *Howse*, 953 F.3d at 408.  The decisive Fourth Amendment question for Weser's claim against Anderson, therefore, is whether Anderson had probable cause to believe that Weser had committed criminal trespass.

For probable cause to exist for an arrest, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (citation

and internal quotation marks omitted).  Weser was arrested and charged with trespassing under Tennessee law.  That offense is defined as follows:

> A person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner.  Consent may be inferred in the case of property that is used for commercial activity available to the general public or in the case of other property when the owner has communicated the owner's intent that the property be open to the general public.

Tenn. Code Ann. § 39-14-405(a).

> The statute also provides that it is "a defense to prosecution under this section" that:
>
> (1) A person entered or remained on property that the person reasonably believed to be property for which the owner's consent to enter had been granted;
>
> (2) The person's conduct did not substantially interfere with the owner's use of the property; and
>
> (3) The person immediately left the property upon request.

*Id.* § 39-14-405(b).  All three elements of this defense must be present for the defense to apply. *State v. Abou-Sakher*, 34 S.W.3d 878, 879 (Tenn. Crim. App. 2000).

As the district court noted, Anderson arrived on the scene and observed that the crate of cats and kittens was placed on Goodson's driveway.  He then interviewed Goodson, who communicated to him that she had not wanted Weser to drop the cats off on her property, but that Weser had done so anyway.  Anderson therefore reasonably concluded that Weser had entered the property without Goodson's consent and that the statutory defense was inapplicable. Accordingly, the district court held that Anderson had probable cause to believe that Weser had committed criminal trespass.  It therefore granted summary judgment in favor of Anderson on this claim.

We affirm the district court's judgment on this issue because that court's analysis is sound, and Weser's counterarguments are not persuasive.  Weser's main contention is that Anderson did not conduct an adequate investigation before he arrested her.  As a general rule, "probable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense.'" *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*,

379 U.S. 89, 91 (1964)).  But Weser quotes *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999), for the proposition that "probable cause does not exist when a minimal further investigation would have exonerated the suspect."  *Id.* at 650 (citation and internal quotation marks omitted).  She argues that both the district court and Anderson ignored various facts that, had they been considered, would have negated the existence of probable cause.

The main problem for Weser is that, even taking the facts in the light most favorable to her, there was still probable cause for Anderson to believe that she had committed criminal trespass, and no further investigation would have exonerated her.  There is no doubt that Weser entered Goodson's property when she offloaded the crate of cats and kittens on Goodson's driveway.  The central legal question is whether she had Goodson's consent at the time she did so, or whether she could have reasonably believed that she did.

Weser alleges that, on November 7, 2016, she had begun transporting the felines to Goodson's house well before Goodson notified Weser that that night was not an acceptable time to return them.  The relevant issue, however, is not what Weser knew when she left her farm, but rather whether she could have reasonably believed that she had Goodson's consent when she entered Goodson's driveway.  And the Facebook messages between the two women make clear that the answer to that question is "no."  At 6:28 p.m., Goodson wrote:  "Well can't take them now," clearly communicating that she did not wish Weser to bring the cats and kittens that night.  Weser responded at 6:45 p.m.: "They are coming now."  This response demonstrates both that, by 6:45 p.m., Weser had seen Goodson's previous message and that Weser had not yet arrived at Goodson's house (hence her statement that the cats and kittens were currently "coming").  Nevertheless, between 6:45 p.m. and 7:08 p.m., Weser entered Goodson's property, dropped off the crate, and sent Goodson a Facebook message saying:  "Cats in driveway."

Weser thus knew before she got to Goodson's house that she did not have Goodson's permission to enter the property, and Weser could not have reasonably believed that she did.  This is sufficient to provide probable cause to believe both that she committed criminal trespass (by entering the property without consent) and that the statutory defense did not apply (because she could not have reasonably believed that Goodson had given consent).

Weser responds by raising the issue of Goodson's November 3, 2016 letter, contending that the letter "direct[ed] Weser to return the cats on either November 7, 11, or 12." But that is a mischaracterization. Goodson's letter did not direct Weser to return the cats, but rather to contact Burgett, and listed a series of dates on which "we can pick these 8 kitties up." The letter therefore could not have reasonably been interpreted as giving Weser permission to return the cats and kittens herself by entering Goodson's property, particularly after Burgett had explicitly communicated to Weser that the evening of November 7 was not an acceptable time to do so. In short, even when the facts are viewed in the light most favorable to Weser, any further investigation by Anderson would have simply confirmed that there was probable cause to believe that Weser had committed criminal trespass.

Weser's final argument on this issue is that, under Tennessee law, an officer must be present for the commission of a misdemeanor in order to have the authority to arrest an individual for such an offense. She concedes, however, that this requirement does not apply to federal § 1983 cases in this circuit. The Sixth Circuit has explicitly held that the "requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest . . . is not mandated by the Fourth Amendment." *Graves v. Mahoning County*, 821 F.3d 772, 778 (6th Cir. 2016) (quoting *United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996)). Although the Tennessee state law is relevant to Weser's state-law false-arrest claim (as will be addressed below), it cannot support her federal claim. Accordingly, we affirm the district court's grant of summary judgment in favor of Anderson on this issue.

### 2.    *Goodson*

Part B.1. above makes clear that Weser's federal claim cannot proceed against either Anderson or Goodson because Weser's arrest was not in violation of the Fourth Amendment. There is also an additional reason why that claim fails with respect to Goodson; namely that, unlike Anderson, Goodson is a private citizen. Section 1983, by its own terms, applies only to those who act "under color" of state law. Therefore, as a general rule, § 1983 does not reach the conduct of private parties acting in their individual capacities. *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007).

There are, however, several exceptions to this rule.  As this court has noted, the Supreme Court has recognized "three tests for determining the existence of state action in a particular case:  (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test."  *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003).  Under the nexus test, a § 1983 plaintiff "must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself."  *Id.* at 834.

A plaintiff may also allege that a private party has engaged in a conspiracy or concerted action with other state actors.  Under such circumstances, "[p]rivate persons may be held liable under § 1983 if they willfully participate in joint action with state agents."  *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).  This court has set out the standard for proving a civil conspiracy under § 1983 as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)).

Weser makes no allegations that Goodson was performing a public function or that the state-compulsion test would apply.  To succeed in her claim against Goodson, therefore, Weser would need to show either that the nexus test is satisfied or that Goodson and Anderson were engaged in a civil conspiracy.

The case that resolves this issue under either test is *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).  In *Moldowan*, the plaintiff had previously been convicted of abducting and sexually assaulting a woman named Maureen Fournier, but his conviction was later reversed after new evidence of his innocence came to light.  Moldowan then brought suit against numerous defendants, including Fournier.  He alleged that Fournier and members of the Warren Police Department conspired to violate his constitutional rights "by fabricating evidence or

withholding exculpatory evidence." *Id.* at 366, 399.  This court held that, under any applicable test, "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" *Id.* at 399.  It thus held that Fournier was not subject to liability under § 1983, and it granted summary judgment in her favor on Moldowan's conspiracy claim. *Id.*

Weser does not attempt to distinguish *Moldowan* in either of her briefs.  Instead, Weser contends that "there is significant circumstantial evidence" of conspiracy or concerted action on Goodson's part (although she concedes that there is "little direct evidence" of it).  This evidence, according to Weser, consists of "the multiple affirmative falsehoods Goodson told to the public officials," "the multiple misleading omissions," and "the prolonged, malicious campaign of falsehoods about Weser that Goodson spewed into the community before the November 7 incident."

Even accepting Weser's recitation of the facts, however, *Moldowan* dooms this line of argument.  The essence of the charge against Fournier in *Moldowan* was that she had fabricated evidence or withheld exculpatory evidence.  *Id.*  That was not enough, this court held, to subject her to liability under § 1983.  The same conclusion applies here.  Even if Goodson deliberately lied in her statements about Weser, that would not show that her conduct was fairly attributable to the state or that she was participating in a joint action with state agents.  We accordingly affirm the district court's grant of summary judgment in Goodson's favor on this claim.

## C.     State-law claims

Weser also raises claims under Tennessee state law for false arrest, false imprisonment, and malicious prosecution.  As under federal law, "the claims of false arrest and false imprisonment are the same" under Tennessee law when the alleged false imprisonment arises out of an alleged false arrest by a law-enforcement officer.  *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *20 (E.D. Tenn. Dec. 12, 2005) (discussing Tennessee state-law claims).  These two state-law claims thus completely overlap, so we will again refer to them collectively as a false-arrest claim.

The district court did not analyze Weser's state-law claims as distinct from her federal ones. It instead reasoned that "the absence of probable cause is . . . essential to each of Plaintiff's state and federal claims." After concluding that Anderson had probable cause to arrest Weser, the court granted summary judgment in Anderson's favor on all of Weser's state and federal claims against him. As for Goodson, the district court cited the lack of any state action on Goodson's part as the reason to grant summary judgment in her favor on all of Weser's claims.

This outcome is appropriate with respect to the state-law malicious-prosecution claim. The elements of a Tennessee malicious-prosecution claim are that "(1) a prior suit or judicial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Roberts v. Fed. Express Corp.*, 842 S.W.2d 246, 247–48 (Tenn. 1992). Here, there was probable cause to believe that Weser had committed criminal trespass, which was the offense with which she was charged. That determination disposes of her state-law malicious-prosecution claim. Weser does not contest this conclusion in her briefing, instead simply reiterating her opposition to the district court's probable-cause analysis. We therefore affirm the district court's grant of summary judgment in favor of Anderson and Goodson on this issue.

Weser does, however, provide several distinct arguments for why the outcome of the state-law false-arrest claim should not simply mirror the result on the federal false-arrest claim. Those arguments are discussed below as to each defendant in turn.

### 1. *Anderson*

To prevail on a false-arrest claim under Tennessee law, a "plaintiff must prove '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'" *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). Weser's central argument regarding this claim is that, in Tennessee, an officer has the authority to arrest an individual for a misdemeanor only if the offense is committed in the officer's presence. This requirement is set out in Tennessee Code Annotated § 40-7-103. That statute provides certain

exceptions to this general rule—for example, if the individual is attempting to commit suicide—but none that apply to the present case. *See* Tenn. Code Ann. § 40-7-103(a).

Criminal trespass is a Class C misdemeanor in Tennessee. Taking the facts in the light most favorable to Weser, she did not commit criminal trespass in Anderson's presence. Her initial act of driving onto Goodson's driveway and dropping off the crate of cats and kittens occurred before Anderson and Brewer arrived at Goodson's house. And, according to Weser's version of the facts, she did not reenter the driveway after dropping off the felines. Instead, when the officers arrived, she was legally parked on the street. Weser's arrest was therefore illegal because Anderson did not have the authority under Tennessee law to arrest her.

The question before us—which the district court failed to address—is whether that fact gives rise to a state-law false-arrest tort claim. Weser has presented a plausible case that the answer to that question is "yes." When the facts are viewed in her favor, she was unquestionably detained against her will, and that detention was unlawful. Weser has not, however, cited any case in which a Tennessee court has held that this set of circumstances is sufficient to state a false-arrest tort claim. Instead, the cases that she relies on are all *criminal* cases, in which defendants raised the issue of an officer's authority to conduct the arrest in order to seek the suppression of evidence that was contemporaneously seized. *See, e.g.*, *State v. Duer*, 616 S.W.2d 614, 615 (Tenn. Crim. App. 1981); *see also State v. Folds*, No. 01C01–9308–CC–00278, 1995 WL 89701, at *3–5 (Tenn. Crim. App. Mar. 3, 1995) ("Appellee's arrest was illegal and evidence obtained as a result of an illegal arrest cannot be used to help convict a defendant.").

For his part, Anderson cites some broad language in Tennessee caselaw suggesting that probable cause might be an absolute defense to a false-arrest claim. *See, e.g.*, *Christian Bros. Univ.*, 428 S.W.3d at 54 ("Like the tort of malicious prosecution, false imprisonment requires that the defendant must have acted without probable cause."); *see also Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 920 (Tenn. Ct. App. 1987) (containing the exact same language). Yet none of these cases answer the relevant question here: probable cause *of what*? In other words, none of them involve a situation like the present one in which an officer had probable cause to believe that an individual had committed a criminal offense, but not *an arrestable offense*. We are unaware of any such cases, nor have the parties alerted us to any in their post-argument

briefing on this specific subject. Whether an individual may pursue a state-law false-arrest tort claim under this scenario thus appears to be an issue of first impression in Tennessee.

Ordinarily, in evaluating issues of state law, if a state's highest court has not addressed a particular issue, we predict what that court would do if presented with the same question. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). This case, however, involves an additional consideration. The district court has already granted summary judgment in favor of Anderson and Goodson on Weser's lone remaining federal claim. Because there is no diversity of citizenship between the parties, the only basis for a federal court to exercise jurisdiction over the remaining state-law claims would be under the supplemental-jurisdiction provisions of 28 U.S.C. § 1367. A district court, however, "may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (citation omitted). Section 1367(c)(1) also provides that a district court may decline to exercise supplemental jurisdiction over a state-law claim if the claim "raises a novel or complex issue of State law."

We conclude that the circumstances here counsel in favor of declining to exercise jurisdiction over the false-arrest claim against Anderson. The claim presents a novel issue of state law that, to the knowledge of both the parties and ourselves, has never been squarely addressed by the Tennessee courts. Where both parties have made plausible arguments in favor of their respective positions, this issue is therefore better left for the state courts to decide, especially given that all of the federal claims have already been dismissed. Accordingly, we vacate the district court's judgment as to the state-law claims for false arrest and false imprisonment against Anderson, and we remand the case to the district court with instructions to decline to exercise supplemental jurisdiction over those claims.

### 2.    *Goodson*

That brings us, finally, to Weser's state-law false-arrest tort claim against Goodson. Goodson, of course, did not herself arrest Weser; she simply called 911 and then spoke with Anderson before Anderson effected the arrest. When a private citizen "provid[es] information to

a police officer" and another person is ultimately arrested, that alone "will not render [the private citizen] liable" on a false-arrest claim. *Roberts v. Essex Microtel Assocs., II, L.P.*, 46 S.W.3d 205, 213 (Tenn. Ct. App. 2000) (citation and internal quotation marks omitted). In other words, "[o]ne cannot be held liable for false imprisonment where he merely informed an officer of circumstances which aroused his suspicions, but made no request or suggestion that the suspected person be arrested, and the officer, of his own volition, made an arrest." *Hertzka v. Ellison*, 8 Tenn. App. 667, 674 (1928).

A private citizen will, however, be "subject to liability for false arrest where one files a complaint with the police without exercising reasonable care in reporting the crime." *Ross v. Gunter*, No. 86-162-II, 1986 WL 14224, at *3 (Tenn. Ct. App. Dec. 17, 1986) (citing *(Blue) Star Serv., Inc. v. McCurdy*, 251 S.W.2d 139, 144 (Tenn. Ct. App. 1952)). Under such circumstances, "[i]t . . . matters not whether defendant directly order the arrest, if he set in motion the machinery which proximately caused the arrest; that is, if the arrest was not the act of the officer or other person making the arrest on his own volition." *(Blue) Star Serv.*, 251 S.W.2d at 143.

Weser contends that Goodson is liable for false arrest because, in Goodson's interactions with the police, she made "demonstrable falsehoods and misrepresentations" with "obvious malice" toward Weser. These "inflammatory lies and misrepresentations," Weser contends, carried with them an implied request that Weser be arrested and were Anderson's purported bases for the arrest. Goodson counters that she merely provided information to Anderson and that this is not enough to subject her to liability.

Weser's claim is not frivolous. Goodson, after all, said on the 911 call that Weser was a "crazy woman," that Weser was "sitting in our driveway" with "a gun in her car," and that Weser was "drunk off her butt." Weser also highlights the fact that, after Anderson arrived, Goodson told him that Weser was a drunk, that she had dumped a crate of stray cats in the driveway, and that Goodson had recently fired Weser. Taking Weser's version of the facts as true, most of these assertions were false. There is at least an argument to be made, therefore, that a jury could conclude that Goodson deliberately lied or exaggerated in an attempt to have Weser arrested.

Nevertheless, we reject Weser's claim because none of these alleged lies or exaggerations are the *reason why* she was arrested. *See id.* Weser was instead arrested because Goodson reported—accurately—that Weser had dropped a crate of cats and kittens off on Goodson's driveway without permission. Despite Goodson exaggerating elements of the story, the core facts were accurately conveyed to Anderson and were enough to provide probable cause to believe that Weser had committed criminal trespass. And Anderson testified that Goodson did not request that Weser be arrested. Anderson instead acknowledged that he made the decision to arrest Weser based on his own experience and judgment.

The only reason why Weser's arrest might have been "false" is because of the Tennessee state law requiring that a misdemeanor be committed in an officer's presence for it to be an arrestable offense. But Anderson was the one who made that decision, and we see no reason why Goodson should be held accountable for Anderson's lack of knowledge of the applicable state law. In short, there is an absence of any nexus between Goodson's alleged false exaggerations in reporting the offense and the key facts that supported Weser's arrest. We therefore affirm the district court's grant of summary judgment in favor of Goodson on this issue.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's judgment in favor of Goodson as to all claims against her. With respect to Anderson, we **AFFIRM** the district court's judgment in his favor as to the federal claims and the state-law claim for malicious prosecution, **VACATE** the district court's judgment in his favor as to the state-law claims for false arrest and false imprisonment, and **REMAND** the case to the district court with instructions to decline to exercise supplemental jurisdiction as to those remaining claims.