RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

RYAN BOSHAW,

*Plaintiff-Appellant*,

No. 21-1365

*v.*

MIDLAND BREWING COMPANY; DONNA REYNOLDS;
DAVE KEPLER,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:19-cv-13656—Thomas L. Ludington, District Judge.

Argued:  October 20, 2021

Decided and Filed:  April 26, 2022

Before:  BATCHELDER, LARSEN, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Collin H. Nyeholt, LAW OFFICES OF CASEY D. CONKLIN, PLC, Okemos, Michigan, for Appellant.  Anne-Marie Vercruysse Welch, CLARK HILL PLC, Birmingham, Michigan, for Appellees.  **ON BRIEF:**  Collin H. Nyeholt, LAW OFFICES OF CASEY D. CONKLIN, PLC, Okemos, Michigan, for Appellant.  Anne-Marie Vercruysse Welch, CLARK HILL PLC, Birmingham, Michigan, for Appellees.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  Midland Brewing Company hired Ryan Boshaw to work as a server.  Midland soon promoted Boshaw, three times in all, ultimately to the second-

highest ranking position in its restaurant.  But before long, trouble was brewing for Boshaw. Following a series of missteps, he was fired roughly one year after joining Midland.  Boshaw sued Midland, its owner, and his supervisor, alleging that they discriminated and retaliated against him, primarily due to his sexual orientation, in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA).  The district court granted defendants' motion for summary judgment on all claims.  We affirm.

## BACKGROUND

Boshaw, an openly gay man, began working as a server at Midland Brewing in May 2018.  A few months into Boshaw's tenure, Donna Reynolds, Boshaw's supervisor, spoke with him about taking on a leadership position.  Boshaw mentioned to Reynolds "something about not wanting to be . . . a server or bartender forever" and that he "wanted to learn more stuff."  The next day, Reynolds "told [Boshaw] that before she presented the opportunity" to move into a "leadership role" to Midland's majority owner, David Kepler, Boshaw "needed to change [his] appearance and kind of just act a little more masculine."  Reynolds also instructed Boshaw to style his hair differently and remove visible body piercings.  And she told him to remove his Facebook relationship status, which indicated that he was dating a man.  According to Boshaw, Reynolds told him that if he "wanted a promotion, [his partner] would understand that it . . . would make sense at the time."

Boshaw changed his hairstyle from spiky to combed over.  And he deleted his Facebook relationship status.  But the record is devoid of any evidence that Boshaw changed how he acted to appear "more masculine" or otherwise hide his sexual orientation.  Indeed, Boshaw never removed posts from his public Instagram page, which included pictures of himself, his two children, and his partner, and often used hashtags such as "#gayselfie" and "#gayswithkids."

In September 2018, not long after their conversation, Reynolds promoted Boshaw to an hourly managerial position. And Boshaw was promoted twice more:  first, in November 2018, to the position of floor leader, and then again in January 2019, to front-of-house operations manager, the second-highest position in Midland's restaurant.  Over this period, Boshaw reposted his relationship status to his Facebook page, which indicated that he began dating his

partner in 2017.  Boshaw also continued to post pictures of himself, his children, and his partner on Instagram, and used hashtags referencing his sexual orientation.

Despite Reynolds's comments to Boshaw about his masculinity and sexual orientation, they seemingly had a positive relationship.  For example, in June 2018, Boshaw texted Reynolds that she was "the best boss ever."  In December 2018, Boshaw sent Reynolds a text thanking her "for all that you do for me as my boss and on a personal level," and acknowledging that "I am where I am . . . on the ladder at [Midland] because of you."  And in early January 2019, Boshaw told Reynolds that he felt "blessed to have [her] as [his] guide" and thanked her for believing in him.

There is also evidence that Reynolds and Kepler repeatedly persuaded Boshaw to remain with Midland, even after he threatened to quit.  When Boshaw received an offer from another restaurant, Kepler offered to increase Boshaw's salary if he would stay at Midland.  Then, in February 2019, Boshaw told Kepler about Reynolds's comments regarding Boshaw's masculinity and sexual orientation.  Kepler was upset; he told Boshaw that he would "make things right" with Reynolds and have Reynolds "make things right" with Boshaw.  He also encouraged Boshaw to stay at Midland.

Despite his promotions, Boshaw's employment record was not spotless.  For example, in January 2019, Reynolds criticized Boshaw's communication skills after customers found a blue hair in their food.  On another occasion, Reynolds warned Boshaw to be more communicative after Boshaw unilaterally tried to resolve issues relating to Midland's point-of-sale system.  In April 2019, Reynolds also directed Boshaw not to interview or hire any back-of-house staff without her involvement.  And the following month, Reynolds learned that Boshaw brought the wrong applicant's resume to an employee interview.  Around the same time, Kepler emailed Reynolds to express frustration that Boshaw had departed from his assigned job responsibilities, noting that Boshaw would not "stay in his lane."

The final straw for Boshaw was missing a mandatory meeting and then not showing up to work that evening.  Boshaw claims that he received permission for his absences.  Yet he does not dispute that he confirmed his schedule with Reynolds the night before his absences.  Nor does he

dispute that he texted a co-worker, Megan Moody, to complain that Midland's meetings "are such a waste of time," he was unwilling to find childcare for an "all day long" shift, and he was "going to get out of it." Other evidence similarly suggests that Boshaw knew of his work obligations. Around 2:30 p.m. on the day in question, Boshaw texted Moody that he would relieve her around 6:00 p.m. Reynolds's lone communication with Boshaw that day was a text just before 5:00 p.m. asking Boshaw to call her. But Boshaw never called. Midland fired Boshaw the following day due to his "absence and failure to notify management" in addition to "other issues."

After his firing, Boshaw filed a complaint with the Equal Employment Opportunity Commission. In his complaint, Boshaw alleged that Reynolds told him to "hide" his sexual orientation by removing his Facebook relationship status. He added that, after he complained to Kepler about Reynolds's "unfair treatment and hostility" toward him, Reynolds's "behavior continued." Although it could not conclude that Boshaw had established a Title VII violation, the Commission gave Boshaw a right-to-sue letter. Letter in hand, Boshaw sued Midland, Kepler, and Reynolds, alleging sex discrimination and retaliation in violation of Title VII and the ELCRA, and civil rights conspiracy under the ELCRA. Defendants moved for summary judgment on all claims. The district court granted summary judgment. Boshaw now appeals.

## ANALYSIS

We review the district court's grant of summary judgment de novo. *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 445 (6th Cir. 2021). Summary judgment is proper when, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Boshaw is the nonmovant, we view the evidence in the light most favorable to him. *M.J. ex rel. S.J.*, 1 F.4th at 445. Conclusory allegations, however, are not evidence and will not, by themselves, permit Boshaw to survive summary judgment. *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020); *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

A.  *Statute of Limitations*.  As an initial matter, Midland argues that Boshaw's Title VII claims are untimely.  We disagree.  Title VII required Boshaw to file suit within 90 days of receiving a right-to-sue letter from the EEOC.  42 U.S.C. § 2000e-5(f)(1).  He did so. Nonetheless, Midland argues that Boshaw's suit is untimely because he did not bring it within 180 days of his termination, as required by his employment contract.  But because Title VII's statute of limitations is a substantive statutory right that an employee may not prospectively waive, the contractual provision at issue is unenforceable.  *See Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829, 833 (6th Cir. 2019).  We thus turn to the merits of Boshaw's claims.

B.  *Sex Discrimination*.  Boshaw begins by alleging that Midland discriminated against him on the basis of sex by delaying or denying him a promotion, in violation of Title VII, 42 U.S.C. § 2000e-2(a), and the ELCRA, Mich. Comp. Laws § 37.2202 *et seq.*  (He does not contend that Midland fired him because of sex discrimination.)  Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment," or "limit[ing] . . . or otherwise adversely affect[ing] [an individual's] status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).  The law likewise prohibits an employer from allowing sex to serve as "a motivating factor for any employment practice, even though other factors also motivated the practice."  *Id.* § 2000e-2(m).  In response to a motion for summary judgment, Boshaw was required to present evidence sufficient for a rational jury to find that he suffered an adverse employment action because of prohibited discrimination.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000).

Boshaw asserts two theories of sex discrimination.  One is that he suffered discrimination based on sex stereotypes when Reynolds allegedly told Boshaw to act more masculine before she would recommend his promotion.  In the aftermath of *Price Waterhouse v. Hopkins*, Title VII's prohibition on sex discrimination has been understood to include a prohibition on discriminating against an employee due to a failure to conform to traditional sex stereotypes. 490 U.S. 228, 251 (1989) (plurality opinion).  Boshaw's second theory of sex discrimination is that he suffered discrimination based on sexual orientation when Reynolds allegedly conditioned Boshaw's promotion on removing his Facebook relationship status.  For decades, Title VII's

prohibition on sex discrimination did not encompass discrimination based upon an employee's sexual orientation.  *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1833–34 (2020) (Kavanaugh, J., dissenting).  Two years ago, however, that prohibition was discovered in the statute, making it applicable to Boshaw's case.  *See id.* at 1743 (majority opinion).  With respect to Boshaw's state law claims, we analyze them here under the same Title VII framework. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012).  Michigan courts have not extended the Supreme Court's reasoning in *Bostock* to the ELCRA.  *See Rouch World, LLC v. Dep't of Civil Rights*, 961 N.W.2d 153 (Mich. 2021) (granting leave to consider the question).  But even if the ELCRA did provide the same protections as Title VII, it would make no difference to the outcome.

With these two theories of sex discrimination in mind, we consider Boshaw's claims that Midland improperly delayed or denied his promotions.  According to Boshaw, he was generally "disfavored for promotion by reason of his sexual orientation," and his promotion to front-of-house operations manager in particular was "conditioned on his agreement not to publicly disclose" his sexual orientation.  True, Boshaw's testimony about Reynolds's statements might allow a jury to find that Reynolds harbored discriminatory animus.  But to survive a motion for summary judgment, Boshaw must offer evidence that would permit a rational trier of fact to find that Reynolds's animus caused Boshaw to suffer an adverse employment action (in this case, the delay or denial of a promotion).  *See Threat v. City of Cleveland*, 6 F.4th 672, 678–79 (6th Cir. 2021) (noting that Title VII requires a plaintiff prove an adverse employment action that is not de minimis); *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 757–58 (6th Cir. 2004) (explaining that the "ultimate question" in a Title VII case includes "a determination of whether there was evidence from which the jury could have concluded that the action of which [the plaintiff] complains was adverse . . . .").  And there is no evidence that Reynolds, Kepler, or Midland delayed or denied Boshaw a promotion.  Instead, the record indicates that Midland promoted Boshaw shortly after he spoke to Reynolds about taking on a leadership position, and he was subsequently promoted two times after that.  Boshaw's subjective belief that Reynolds discriminated against him is not enough for a rational trier of fact to find that discrimination occurred.  *See Doe v. City of Detroit*, 3 F.4th 294, 304 (6th Cir. 2021).

Boshaw claims that Reynolds conditioned his promotion to front-of-house operations manager on "his agreement not to publicly disclose" his sexual orientation and to act more masculine. But Boshaw offers no evidence that this promotion, which was his third, was delayed by such a condition. True, Boshaw removed his Facebook relationship status before his first promotion. Yet during the same period, Boshaw posted pictures of himself, his children, and his partner on his public Instagram page with hashtags such as "#gayselfie" and "#gayswithkids," suggesting that Reynolds's condition had no impact on the promotion decision. At all events, the status was public on Facebook when Boshaw received his second and third promotions. In other words, Boshaw was promoted despite his open and obvious noncompliance with the supposed condition on his social media postings. To the extent Boshaw argues that the fact he was promoted only after he changed his hairstyle from "spiky" to "combed over" is evidence of gender stereotyping, we know of no such stereotype, and Boshaw fails to identify one.

In all, Boshaw secured three promotions in eight months, rising from an entry-level server to front-of-house operations manager. All things considered, Boshaw's rapid rise shows that Midland did not delay or deny his promotions because of sex discrimination. No rational trier of fact could find otherwise.

In response, Boshaw faults the district court for concluding that he offered no direct evidence of sex discrimination. But even if Boshaw did produce direct evidence of discrimination, he still needed to come forward with evidence that he suffered a material adverse employment action because of the unlawful discrimination. *Threat*, 6 F.4th at 678–79. Because he did not do so, whether Reynolds's statements are direct evidence of discrimination ultimately is not dispositive.

C. *Retaliation*. We next turn to Boshaw's retaliation claims. On appeal, he cites two ways in which defendants purportedly retaliated against him for reporting sex discrimination to Kepler: one, Reynolds subjected him to "hyper scrutiny" and harassment; and two, he was fired. Because Boshaw relies on circumstantial evidence of retaliation, we apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze these claims. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). To state a prima facie case of retaliation under the *McDonnell Douglas* framework, Boshaw must

demonstrate that: (1) he engaged in protected activity; (2) defendants knew he exercised his protected right; (3) defendants subsequently took an adverse employment action against him; and (4) his "protected activity was the but-for cause of the adverse employment action." *Kenney*, 965 F.3d at 448. If Boshaw establishes a prima facie case, the burden of production shifts to defendants to identify a legitimate, non-retaliatory reason for their action. *See id.* Should defendants do so, "the burden of production shifts back to [Boshaw] to demonstrate that [defendants'] proffered reason was a mere pretext" for unlawful retaliation. *Id.*

As to his hyper-scrutiny claim, Boshaw testified that Reynolds expressed anger toward him for speaking with Kepler, and that after his follow-up conversation with her, he could not "do[] anything right." Yet he offered little testimony or other evidence as to how things changed for him. And the record contains evidence of instances where Reynolds criticized or reprimanded Boshaw based on legitimate grounds. For example, Reynolds scrutinized Boshaw after he failed to inform her that a certain employee's hair was often found in customers' meals, again when he contacted one of Midland's software vendors without first speaking with Reynolds, and yet again for bringing the wrong resume to interview a prospective employee. In view of this evidence, Boshaw's hyper-scrutiny retaliation claim does not survive summary judgment.

Much the same is true as to Boshaw's retaliatory termination claim. Here too, Boshaw fails to make a prima facie showing of but-for causation. As we have said before, the more that a protected activity is temporally distant from the adverse employment action, "the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citation omitted). In this case, three months passed between Boshaw's complaint to Kepler and his termination, a firm indicator of a lack of a causal link. *See Kenney*, 965 F.3d at 449 (concluding that a 75-day delay between protected activity and an adverse employment action alone could not support a jury finding of causation).

Boshaw has failed to identify other evidence satisfying the causation element. He points to his deposition testimony that Reynolds expressed anger toward him after learning that he spoke with Kepler about their prior conversation, that Reynolds' hyper-scrutiny of his work

followed that conversation, and that he was terminated for missing a single meeting and shift but at least one other manager was "frequently absent without suffering any discipline." Reynold's hyper-scrutiny, as already explained, fails to move the needle. As for his claim that he was treated differently than a similarly situated employee, *see Nguyen*, 229 F.3d at 563, Boshaw compares himself to another employee who, he says, was not disciplined for absenteeism. Yet he offers no evidence of that employee's attendance record. Nor does he explain how a reasonable trier of fact could find that Kepler's treatment of another employee shows that Kepler fired Boshaw in May because of their conversation in February. Boshaw also has not shown that he was similarly situated to the other employee. By his own admission, Boshaw's job was "unique" because he managed Midland's front-of-house. He was also the other employee's boss; she merely managed Midland's bar under his supervision. And unlike Boshaw, she attended Midland's problem-solving meeting and her assigned shift that night. Suffice it to say, Boshaw's threadbare allegation of disparate treatment lends no support to his retaliation theory. *See Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (noting the "relevant factors" for the similarity-situated analysis "often include" the employees' supervisors, job responsibilities, and conduct).

Even if Boshaw had made a prima facie showing of retaliatory termination, he cannot show that Midland's reasons for his termination were pretextual. In an effort to do so, Boshaw asserts that Midland's proffered reason for his termination has no basis in fact, *see Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021), because Kepler knew that Boshaw believed he had permission to be absent. But it was only after Kepler fired Boshaw, not before, that Kepler learned that Boshaw believed the absences were excused. Kepler's affidavit, moreover, explains that he fired Boshaw after Boshaw missed the May 30, 2019 meeting and shift. And Boshaw stated in his deposition that he believes Kepler "honestly thought [he] missed a mandatory meeting and a shift." This evidence satisfies the "honest belief rule," which precludes a finding of pretext when an employer's nondiscriminatory reason for terminating an employee is later proven false, so long as the employer can show that it honestly believed the reason was true when making the termination decision. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 572 (6th Cir. 2021). The district court thus did not err in granting summary judgment to Midland on Boshaw's Title VII retaliation claims (nor, for the same reasons, on his ELCRA

retaliation claims). *See Kenney*, 965 F.3d at 451 (explaining that courts analyze ELCRA retaliation claims using the federal Title VII framework).

D.   *Conspiracy*.   Relatedly, Boshaw argues that the district court erred by granting summary judgment to defendants on his retaliation-based conspiracy claims.  But having failed to establish wrongful acts of retaliatory conduct by defendants, Boshaw cannot show a conspiracy to retaliate.  *See Shuayto v. Lawrence Tech. Univ.*, No. 329520, 2016 WL 6992739, at *8 n.2 (Mich. Ct. App. Nov. 29, 2016) (per curiam) (rejecting an ELCRA conspiracy claim when the plaintiff failed to prove an underlying violation of the Act); *Harris v. Turner Constr. Co.*, No. 263679, 2006 WL 1330119, at *4 (Mich. Ct. App. May 16, 2006) (per curiam) (same).

E.   *Hostile Work Environment*.   Lastly, Boshaw asserts that, contrary to the district court's conclusion, he fairly pleaded a hostile work environment claim in his amended complaint.   Boshaw's amended complaint, all agree, alleged several discrete instances of disparate treatment and retaliation.   And as a general rule, a plaintiff's complaint need not expressly plead legal theories; it is sufficient to plead factual allegations that can establish a viable theory. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021).   But in the employment setting, while "[d]iscrete-discriminatory-act and hostile-work-environment claims are both species of discrimination claims," they are nonetheless "'different in kind.'" *Dulaney v. Flex Films (USA), Inc.*, 2021 WL 3719358, at *5 (6th Cir. Aug. 23, 2021) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).   In particular, a hostile work environment claim requires a plaintiff to demonstrate a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).   Yet all Boshaw alleged were "isolated incidents," which are not enough, standing alone, to state a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

**CONCLUSION**

We affirm the grant of summary judgment.