NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0212n.06

Case No. 22-3574

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ZANETA SHIVERS,

     Plaintiff - Appellant,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant - Appellee.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
May 04, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

OPINION

Before: GIBBONS, THAPAR, and BUSH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Following her termination, Zaneta Shivers sued her former employer, Charter Communications, Inc., alleging unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination and Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and Ohio Revised Code § 4112. She also alleged state common law claims for wrongful discharge, implied contract, promissory estoppel, and intentional infliction of emotional distress. Shivers appeals the district court's grant of summary judgment on her claims and its dismissal of her state law claims without prejudice. Because we conclude that Shivers did not establish a prima facie case of discrimination or retaliation, we affirm.

I.

In 2001, Zaneta Shivers began working for Time Warner Cable ("TWC"), which was later acquired by Charter Communications, Inc. ("Charter"). With the acquisition, Charter's policies

and procedures replaced TWC's. Charter's Employee Handbook provided that "[v]iolations of provisions of this Handbook, or any policy, rule, or guidance, may result in corrective action, up to and including separation from the company, regardless of whether this is specifically stated in the pertinent policy, rule or guidance." DE 25-1, Tucker Decl., Page ID 133. Its Code of Conduct requires that employees appropriately address customer concerns or needs, behave professionally when interacting with customers, and make every effort to ensure the customer's experience is exceptional before ending an interaction. Code violations could "result in corrective action, up to and including termination[.]" *Id.* at 183.

While Charter regularly employed a progressive discipline policy, certain levels of discipline could be skipped depending on the severity of the violation. For instance, Charter employed a zero-tolerance policy—resulting in termination—if employees hung up on customers. The zero-tolerance policy was enforced consistently although it was not written in the Handbook or Code of Conduct, and awareness of it varied.

In February 2018, Shivers transferred to the position of Credit Service Associate ("CSA"). CSAs were divided into four teams with different supervisors. Each team had primary responsibility for customer accounts in a specific region of the country. Shivers reported to Credit Services Supervisor Joshua Bliss, whose team was responsible for resolving issues primarily for West Coast customers. When a customer contacted Charter with a payment-related issue, a CSA assigned to that region would review and resolve that "ticket." DE 25-2, Bliss Decl., Page ID 200.

CSAs performed two tasks: (1) balance transfers, involving the transfer of money from one account to another, and (2) payment research. Most of the tickets handled by Bliss's team involved payment research for West Coast customers. Despite working primarily with West Coast customers, Shivers worked an East Coast 9:00 a.m. to 5:00 p.m. shift. Shivers had access to the

CSG and Charter billing systems, both used for West Coast customers. Most of the team's work was in the CSG system.

When Shivers began as a CSA, Michelle Bates trained her on balance transfers. She was assigned only balance transfer tickets for around two weeks. Bates then trained Shivers for one day on conducting payment research. Tickets came in overnight and were assigned by a team member and approved by Bliss the next morning. Over twenty-five tickets were assigned to Shivers each day.

Charter's established method of evaluating the effectiveness of CSAs was based in part on the percentage of tickets that each CSA successfully resolved. At minimum, a CSA's goal was to achieve 90-95% success (partially meets expectations), with higher goals being 95-100% success (meets expectations) or 100-105% success (exceeds expectations). Shivers did not meet the minimum goal in April or May 2018, resolving approximately 60-61% of the tickets each month.

In June 2018, new management at Charter implemented an across-the-board change to the CSA's performance goals. The number of tickets needing resolution each day jumped from thirty-five to forty-five, and the number of days a ticket could go unresolved decreased from seven to three days. Shivers testified that, at that time, her coworker Jason Berner would "raid" her tickets to reassign easier tickets to himself, but he "slowed down" on taking her easier tickets after she threatened to go to human resources. DE 25-3, Shivers Dep., Page ID 427-29.

Shortly after this change, Shivers complained to Joanne Gorte, Bliss's manager, about feeling "oppressed" due to the increase in required ticket resolutions and decrease in expected completion time. *Id.* at 430, 434. She also complained about being given access to different computer systems but not receiving sufficient training on them and wanting to switch off of Bliss's team.

After that conversation, Bliss held a one-on-one session with Shivers to coach her on addressing payment research tickets efficiently. He also arranged for Kelly Dawson, a more experienced CSA, to provide three additional days of training to Shivers on payment research. In September 2018, Shivers sat with Dawson to observe her work, and Dawson also observed Shivers at work and offered her guidance on how to perform her tasks. Then, in November 2018, Bliss documented a verbal coaching session he had with Shivers regarding her attendance. However, Bliss notes that Shivers still failed to meet the minimum goal in November 2018, instead scoring only 64.83%.

In early December, Bliss told Shivers that she would be "receiving documented counseling" because of her "inability to meet the minimum departmental performance goals." DE 25-2, Bliss Decl., PageID 201; *see also id*. at 210 ("Zaneta . . . is going to be receiving a documented counseling for performance."). Bliss stated that he issued the documented counseling two weeks later in the form of a performance improvement plan ("PIP"). As part of the PIP, Shivers was put on the mail team, which reduced her number of tickets and made it easier for her to reach her performance goals.

Between the time that Bliss notified Shivers that she would receive documented counseling and the issuance of the PIP, Shivers requested a meeting with Julie Tucker, Charter's Human Resources Manager. During that meeting, Shivers told Tucker that Bliss had "a personal issue against" her because of "[her] age, because of [her] tenure with the company, because [she] was a black woman." DE 25-3, Shivers Dep., PageID 435-36, 562. Shivers also complained that Bliss denied all of her vacation requests.

At Charter, there were certain rules regarding vacation leave, including that employees could not take off more than one major holiday—meaning the week before, during, and after the

holiday. On any given day, two people per supervisor were permitted a scheduled day off, and senior employees had priority. Charter would also honor preexisting scheduled days off for internal new hires. Bliss both approved and denied Shivers's requests for vacation leave. Bliss and Shivers agree that Bliss occasionally approved Shivers's leave on short notice or modified her leave when she had to change a previously scheduled time frame.

At one point, Shivers also complained to Bliss about having West Coast tickets but being on an East Coast shift schedule. Bliss instructed her to put the tickets for West Coast customers aside until she could call them at 9:00 a.m. West Coast time. Bliss also explained that a CSA should be able to resolve 80% of payment research tickets without customer calls if all the banking tools were used. At the time, Bliss lacked the ability to assign Shivers any East Coast tickets "because she was a CSG team member working CSG tickets." DE 31, Bliss Dep., Page ID 1157.

On her 2018 annual performance review, Shivers received a score of 2.3 on a five-point rating scale,[1] meaning "Partially Achieved Expected Performance." DE 25-3, Shivers Dep., PageID 393–94; DE 25-2, Bliss Decl., PageID 201. That score was too low to qualify her for an annual merit increase—which required a minimum score of 3.0—and CSAs were not eligible for bonuses.

On March 28, 2019, Shivers called a customer to obtain additional information from her to locate a payment. The customer was "belligerent" from the outset and kept trying to cut Shivers's explanation short. DE 25-3, Shivers Dep., Page ID 275-77. Shivers states that she had to end the call because the customer was not listening to her, kept escalating the situation, and was verbally

---

[1] Shivers states that Bliss was the only one who graded performance based on a performance matrix; other supervisors allowed CSAs "to just complete the work." DE 25-3, Shivers Dep., Page ID 399. Bliss states that they were department-wide metrics. Tucker confirms that Charter used a computer program to evaluate eligibility for an annual merit increase based on a five-point scale, and only employees with an overall score of 3.0 were eligible.

attacking her. She testified that she said goodbye before hanging up and does not remember whether the customer was still talking at that point. While Shivers could have transferred the uncooperative customer to a supervisor, she believed that Bliss was not yet in the office. After hanging up, she notated the customer's account.

The customer called back the next day, spoke to another associate, and complained about his previous call with Shivers. That associate emailed Bliss the customer's information and recommended looking up the call. After listening to the recording, Bliss emailed Tucker, Gorte, Human Resources Generalist Laura Craft, and Human Resources Director Nancy Bradfield about Shivers's performance on the call and sent them a link to the audio recording. Bliss drafted a corrective action form and recommended the issuance of a final warning to Shivers for arguing with and hanging up on the customer. He did not expect that she would be terminated and was unaware of the zero-tolerance policy for hang-ups, as he had not been involved in this type of incident before.

Tucker directed Craft to review the recorded phone call. Bliss and Craft listened to the call together. Upon confirmation from Craft that Shivers hung up on the customer, Tucker "determined and decided that Shivers' action"—the single hang-up—"warranted immediate termination, consistent with Charter's approach to every other intentional customer hang-up incident that I had been involved in or made aware of." DE 25-1, Tucker Decl., Page ID 135. Bliss was informed that Shivers would be terminated due to the severity of her violation and notified about the zero-tolerance policy.

Even after Tucker communicated her termination recommendation, Bliss still thought that a final warning should apply instead. However, he testified that, once he heard of the zero-tolerance policy, his "hands were tied." DE 31, Bliss Dep., Page ID 1151. The request for

termination received approvals from the management team—supervisor Bliss, senior manager Gorte, and director Kay Mushill—as well as Tucker and Human Resources Director Nancy Bradfield.

Two weeks later, Bliss asked Shivers to join him in Gorte's office, along with Craft. Bliss told Shivers she was being terminated for the March 28 hang-up in accordance with Charter's zero-tolerance policy for such behavior. Shivers responded that she was unaware of the policy and thought that progressive discipline applied. She recounts that Craft gave her Tucker's number to call if she did not agree with the decision. Shivers noted that Bliss had paperwork in his hand, but Shivers left the office directly after being terminated and did not receive it. Shivers was forty-seven years old at the time of her termination.

After her termination, Shivers first tried calling Tucker but received no response. She then filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC"). Shivers testified that she believed that Bliss alone singled her out to be terminated for a single hang-up under a nonexistent zero tolerance policy.

Shivers received her right to sue letter in August 2020. Three months later, she sued Charter, alleging that she was wrongfully terminated under federal and state law because of her race and age. Charter denied all allegations and moved for summary judgment on each.

The district court granted Charter's summary judgment motion on Shivers's discrimination and retaliation claims and dismissed Shivers's state law claims without prejudice. The court determined that Shivers failed to establish prima facie discrimination or retaliation. First, it concluded that the alleged issues with Shivers's training, computer access, workload, leave requests, and phone status did not constitute adverse employment actions. Second, although the court considered as adverse employment actions the denial of a raise and bonus, the failure to apply

progressive discipline, and Shivers's termination, it dismissed these claims because Shivers failed to present evidence permitting a finding that she was treated differently than similarly situated non-protected employees. The district court also dismissed Shivers's hostile work environment claim for failure to defend the claim on summary judgment.

Turning to Shiver's retaliation claim, the district court determined that the placement of Shivers on a PIP did not constitute a materially adverse employment action. It then concluded that Shivers did not establish her causation burden regarding her termination and granted Charter's motion on this claim. Last, the district court dismissed Shivers's state law claims for wrongful discharge, breach of implied contract, and promissory estoppel without prejudice to re-filing in state court.

Shivers filed the instant appeal.

II

We review the district court's grant of summary judgment de novo. *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020). A movant is entitled to summary judgment if she shows that there is no genuine dispute of any material fact and that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the nonmovant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In drawing any inferences, we view

the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citations omitted).

III.

Shivers argues that the district court improperly granted Charter summary judgment on her discrimination and retaliation claims. Under the *McDonnell Douglas* framework, she contends that the district court erred in concluding that she did not satisfy either the third or fourth factor of her prima facie burden for each of her claims. We review these arguments in turn.

**1. Race and Age Discrimination Claims**

Shivers asserts her race and age discrimination claims under federal law and Ohio state law, which employ the same analytical framework. *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (ADEA analysis applicable to Ohio age discrimination claims); *Threat v. City of Cleveland,* 6 F.4th 672, 680 (6th Cir. 2021) (Title VII analysis applicable to Ohio race discrimination claims). As Shivers supports her claims with circumstantial evidence, we follow the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

To survive summary judgment, the *McDonnell Douglas* framework requires that Shivers first establish a prima facie case of discrimination by showing that she: (1) is a member of a protected class; (2) is qualified for the job; (3) suffered an adverse employment decision; and (4) was treated differently than similarly situated non-protected employees. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 575 (6th Cir. 2023). If a prima facie case is established, the burden shifts to Charter to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *McDonnell*, 411 U.S. at 802).

Once a nondiscriminatory reason is asserted, the burden returns to Shivers to show that Charter's proffered reason was pretextual. *Id.*

The parties only dispute the third and fourth factors for Shivers's claims. We first consider whether her alleged negative administrative actions amount to adverse employment actions.

A. *Administrative Actions*

An adverse employment action requires a "materially adverse change in the terms or conditions" of employment. *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). This change "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). Adverse employment action "requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id*. at 762; *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). By contrast, de minimis employment actions, which could be described as "mere inconvenience[s] or an alteration of job responsibilities," are not actionable. *Kocsis*, 97 F.3d at 886 (citation omitted).

Shivers argues that she suffered adverse employment actions in the form of (1) insufficient training, (2) denial of and delayed computer access, (3) increased workload assignments, (4) denial of vacation leave, and (5) being singled out to keep her work phone available at all times. Relying on an unpublished district court case, *Brantley v. Cinergy Corp*., No. 101CV378, 2007 WL 2462652 (S.D. Ohio Aug. 27, 2007), Shivers argues that the differential treatment she received—considered individually or collectively—delayed or impacted her ability to perform her job functions and made the terms and conditions of her employment more onerous than that of her

non-protected peers, constituting adverse actions. Charter disputes the underlying facts regarding these allegations, and nevertheless responds that, even if the actions did occur, they are de minimis. Examining each, we conclude that none of the alleged actions constitute adverse employment actions.

To start, Shivers's allegations of insufficient training do not rise to the level of an adverse employment action. It is undisputed that Shivers received training on balance transfers and payment research both at or near the start of her work as a CSA. She started with balance transfer training and does not argue that it was insufficient. And while Shivers asserts that her initial training on payment research did not adequately prepare her, it is undisputed that she received further training on payment research when she requested it. Thus, there is no indication that the delay in payment research training negatively changed the conditions of her employment or "was more disruptive than a mere inconvenience," because she ultimately received the training. *Threat*, 6 F.4th at 679 (internal quotation marks and citation omitted); *c.f. Vitt v. City of Cincinnati*, 97 F. App'x 634, 639 (6th Cir. 2004) (no adverse action from denial of training).

Likewise, Shivers's delayed access to certain computer credentials does not rise to the level of an adverse employment action. Despite an initial one-month delay in gaining access to computer systems, Shivers received access to these systems and could use the credentials of her coworkers to access systems during the delay. *See, e.g., Stewart v. Esper*, 815 F. App'x 8, 18 (6th Cir. 2020) (holding initial denial of access to a specific computer system was de minimis when plaintiff "received access within a month"). Shivers also testified that she had access to the CSG and Charter billing systems and acknowledges that her responsibilities primarily involved West Coast customers with tickets in the CSG system. As to Shivers' assertion that she could never directly access other computer systems, the record reveals that she was asking people under

different supervision—not directly on the CSG team—for the access that they had. Moreover, her testimony reveals that she could still access these computer systems, if at all needed, through others. Even if the lack of access to certain computer systems did negatively affect Shivers's performance to the degree that it constituted an adverse employment action, Shivers would fail on the fourth prong of establishing a prima facie case. She only offers as comparators employees who had access to other computer systems because they were assigned to special projects that gave them this access. On both the third and fourth factors, this claim fails.

Neither does Shivers's workload constitute an adverse employment action. Shivers acknowledges that part of her mounting workload resulted from an across-the-board increase in the required number of resolved tickets and a decrease in the time allowed for resolving those tickets. She also testified that her reception of the harder payment research tickets was partially caused by her colleague's "raid[ing]" of her tickets to reassign the easier batch to himself, which slowed down after she threatened to go to human resources. DE 25-3, Shivers Dep., Page ID 427-29; *c.f. Garcia v. Beaumont Health Royal Oak Hosp*., No. 22-1186, 2022 WL 5434558, at *6 (6th Cir. Oct. 7, 2022) ("Title VII affords [the plaintiff] no right to dictate her employer's dealings with a coworker who is no longer harassing her."). Further, although Shivers argues that her East Coast hours made her West Coast workload more difficult to resolve, she does not dispute her assignment to a West Coast ticket team. Moreover, most payment research tickets could be completed without contacting customers, and payment research was Shivers's job responsibility and the majority of her team's work. Finally, when Shivers requested to be put on a special project, she was put on the mail team—which she acknowledges reduced her workload.

Shivers argues that she was disproportionately denied her preferred vacation requests every time she requested them, including for major holidays. But the record reveals that this was also

not an adverse employment action. Bliss approved many days off for Shivers, including around major holidays. It also appears that Bliss's stated reasons for denying some of Shivers's requests aligned with the stated policies regarding vacation leave. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management."). Here, some denials of vacation requests according to Charter's policy, without more, is not an adverse employment decision.[2] *See Johnson v. United Parcel Service, Inc.,* 117 F. App'x 444, 450 (6th Cir. 2004) (scheduling issues not adverse actions); *White v. Andy Frain Servs.*, 629 F. App'x 131, 134 (2d Cir. 2015) (denial of vacation requests not adverse employment action).

As to Shiver's assertion that she was treated differently by virtue of having to keep her phone on "available status," Bliss explains that all employees used the same phone system that transferred the next incoming call to any "idle" associates. DE 31, Bliss Dep., Page ID 1187. Whether or not the requirement was a departmental policy is unnecessary to resolve, though, because Shivers does not demonstrate how receiving calls constitutes a "change in employment status . . . reassignment with significantly different responsibilities, or . . . a significant change in benefits," *Burlington*, 524 U.S. at 761, and it does not give rise to an inference that Charter increased Shivers's phone call frequency through any official action at any specific time during her employment. *Cf. id.* at 762 (adverse employment action usually requiring "company act"). It therefore does not constitute an adverse employment action.

Standing alone, none of these administrative actions amount to an adverse employment action. But we must also consider "[t]he[ir] cumulative effect*." Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018). The alleged actions still fall short. Shivers asserts

---

[2] Charter does not challenge Shivers's argument that denial of bonuses, performance rating, salary increases, and discipline (termination) were adverse employment decisions.

difficulties resulting from across-the-board decisions increasing workload, company policies applicable to her non-protected counterparts, her own job responsibilities, and coworkers' behavior. She does not establish that she was assigned tasks that other non-protected employees did not also have to perform. She was placed on a special project when she requested it and was not denied specialized opportunities for service that were "informal prerequisites for internal promotions," like in *Brantley*, 2007 WL 2462652, at *17. She does not create a genuine dispute of material fact that she was reassigned to a workload outside the confines of her job responsibilities, *see Kocsis,* 97 F.3d at 885 (affirming that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"), or that she had a disproportionately heavy workload compared to her peers. *See Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) (describing "assignment of a disproportionately heavy workload" as an adverse employment action capable of supporting Title VII liability). Because a reasonable jury could not find that the terms and conditions of her employment were adversely affected, we affirm.

Shivers next alleges that she was denied bonuses and salary increases.[3] Charter does not challenge that these alleged denials would constitute adverse employment actions but rather disputes two other points. First, it argues that Shivers failed to establish that she *suffered* the adverse action of a bonus denial. Here, Charter is correct: it is undisputed that CSAs (like Shivers) were not eligible for bonuses, so she could not have suffered by not receiving one. Second, Charter argues that Shivers failed to show the fourth prong of the prima facie analysis—that Charter treated

---

[3] Charter contends that Shivers waived her arguments regarding an improper denial of a raise and bonus. But Shivers argued in her appellate brief that the district court erred in considering the "disparate rating scale for . . . salary increases" and its "detrimental effect on Ms. Shivers' employment." CA6 R. 13, Appellant Br., at 35. We therefore consider the argument.

similarly situated white or younger employees differently when it came to the performance scale. Shivers counters that the district court erred by holding her to an improperly high standard of proof when it found her employee comparators were inadequate.

A plaintiff satisfies the fourth prong of the prima facie analysis where she demonstrates that a "comparable non-protected person was treated better." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting *Mitchell*, 964 F.2d at 582-83). The comparison need not be an "exact correlation," but Shivers must establish that, in all "relevant aspects," her employment conditions were "nearly identical" to those of white or younger coworkers who received more favorable treatment. *Id.* at 352 (internal citations omitted). Three factors are "generally relevant" to each case: "whether the employees: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (citing, inter alia, *Mitchell,* 964 F.2d at 583). We independently determine the value of Shivers's proffered comparisons. *Ercegovich,* 154 F.3d at 352. The district court undertook this same analysis, and we find no error in its recitation of the legal standard.

Shivers's 2.3 performance evaluation rating precluded her from a merit increase—like a below-3 rating did for all other employees. Shivers failed to identify a similarly situated non-protected employee at Charter with a sub-3 performance score who still received a merit increase. *See Smith v. City of Toledo,* 13 F.4th 508, 515 (6th Cir. 2021); *Simpson v. Vanderbilt Univ.*, 689 F. App'x 450, 451 (6th Cir. 2017) (no prima facie case where plaintiff "failed to identify a suitable [] comparator"). We agree with the district court that she did not establish her *prima facie* case regarding these claims and affirm.

B. *Termination*

Whether Shivers can establish her prima facie case of discrimination based on her termination turns again on the fourth *McDonnell Douglas* factor. Because she provides no suitable comparators establishing differential treatment, this claim fails as well.

Shivers offers several comparators to support her claim, arguing that she suffered more severe treatment for actions taken by other non-protected employees. But none of the comparators she identifies are sufficient. First, all but one of the comparators drawn from Charter's discovery, shared a protected category with Shivers: three of the seven were over 40 years old, and four of the seven were African-American. Even more importantly, none of the offered comparators were supervised by Bliss or retained their jobs after the discovery of a hang-up.

Shivers uses the "most egregious example" of differential treatment to rebut this claim— that the one comparator who was both Caucasian and younger, Employee 6070115, had forty-three hang-ups before being terminated. CA6 R. 13, Appellant Br., at 10-11. However, the termination paperwork reveals that Employee 6070115's multiple hang-ups were discovered in a single routine audit covering an approximately thirty-day period. Documentation shows that this auditing process was used to review other employees and resulted in terminations. Instead of an audit, Bliss discovered the sole hang-up for Shivers because another associate notified him the following day after speaking to the dissatisfied customer. The termination of Employee 6070115 only corroborates that *discovery* of the hang-ups, not necessarily when the hang-up occurred, is the event that immediately prompts termination.

Only one of the other affidavits that Shivers provides for the other "similarly situated" employees speaks to the issue of hang-ups for which Shivers was terminated.[4] Octavia Griggs declared that she remembered hanging up on a rude customer in 2018 and was not terminated at the time. However, there is no dispute of material fact established by Griggs's affidavit because Griggs is an African American over forty years old, thus sharing the same protected characteristics as Shivers, and Griggs worked on a different team under a different supervisor. Thus, this incident cannot establish that Shivers received differential treatment from that of a non-protected comparator.

Finally, we turn to Shivers's contention that the district court ignored whether zero tolerance "was even a real policy." CA6 R. 13, Appellant Br., at 11. But simply because some supervisors and employees were unaware of the policy does not mean that it does not exist. Human resources,[5] charged jointly with leadership to make final decisions regarding employee discipline, has consistently maintained that Charter applies a zero-tolerance policy for customer hang-ups. That policy existed and was applied before Shivers's termination. Although the policy is not formally included in written policy, it is consistent with Charter's policies and procedures, which state that any violations of policies, rules, or guidance, such as how to appropriately address customer concerns or needs, can result in termination. The real issue here is not whether the policy

---

[4] To the degree that Shivers uses the testimony of four African American employees terminated during the same period who were "terminated for improper reasons related to their age, longevity and the higher pay they were all earning," CA6 R. 13, Appellant Br., at 12, pattern-or-practice evidence is generally "inappropriate as a vehicle for proving discrimination in an individual case" because it does not evaluate individual hiring decisions. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) (citation omitted).

[5] Although one Charter Human Resources Business Partner questioned the application of a zero-tolerance policy for an employee with only one hang up, there is insufficient information given about the incident. Moreover, human resources and management in that case still decided to terminate that employee based on a single hang-up.

existed, but rather if Shivers was treated differently in its application. And because Shivers cannot establish a genuine dispute of material fact that other similarly situated colleagues were treated differently under this policy, she fails to establish her claim. We affirm.

## 2. Retaliation

Shivers alleges that her placement on a PIP and her termination were retaliation for her complaints of discriminatory treatment.[6] As with her discrimination claims, we apply the *McDonnell Douglas* burden-shifting framework because Shivers presents indirect evidence. *Laster,* 746 F.3d at 730. To establish her prima facie case, Shivers must establish that "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). Charter disputes the third and fourth prongs of the prima facie claim regarding Shivers's PIP and only the fourth prong regarding her termination.

"Plaintiff's burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Laster,* 746 F.3d at 731 (internal quotations omitted). A materially adverse action "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation and citations omitted).

Placing an employee on a performance improvement plan may meet the "relatively low bar" of constituting a materially adverse action in the context of a retaliation claim. *Michael v.*

---

[6] Charter argues that Shivers waived her right to challenge the district court's order related to her PIP retaliation theory, but we find sufficient support in Shivers's initial brief to consider her argument.

*Caterpillar Fin. Svcs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). But here, the specifics of Shivers's PIP cast doubt as to its material adversity. Through her PIP, Shivers was placed on the mail team, which reduced the number of tickets she had to resolve. She agreed that this placement was beneficial, which, we conclude, likely would not have dissuaded a reasonable worker from making a charge of discrimination. As to causation, Bliss told Shivers that she would be "receiving documented counseling" before she complained to human resources. DE 25-2, Bliss Decl., PageID 201. Bliss could not have retaliated against Shivers *before* she engaged in the protected activity, so she cannot satisfy a prima facie retaliation case on this basis either. *See Fletcher v. U.S. Renal Care*, 709 F. App'x 347, 354 (6th Cir. 2017) ("[T]he 'critical' question for purposes of causation is whether 'the scrutiny increased' after the employee engaged in the protected activity." (quoting *Hamilton v. GE*, 556 F.3d 428, 436 (6th Cir. 2009)). Thus, on either the third or fourth factor, Shivers fails to establish a prima facie case of retaliation based on her placement on a PIP.

As to Shivers's termination, Charter only challenges causation. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation and citation omitted). In other words, Shivers must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013)). "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Shivers contends that she demonstrates causation in two ways. First, like in the discrimination context, she argues that she was treated differently than her similarly situated non-protected peers. Yet Shivers fails to identify any similarly situated non-protected employees who hung up on a customer and were not terminated for the infraction, so there is no genuine dispute of material fact that she was treated differently from her peers. Shivers next argues that she establishes causation through temporal proximity—emphasizing that there were only three and a half months between her complaint of discrimination on December 26, 2018, and her termination on April 16, 2019. However, this time period alone is insufficient to establish causation. *See, e.g., Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) ("[T]hree months passed between [the plaintiff's] complaint to [his employer] and his termination, a firm indicator of a lack of a causal link."); *Barlia v. MWI Veterinary Supply, Inc.*, 721 Fed. App'x 439 (6th Cir. 2018) (three months between protected activity and adverse actions insufficient). Apart from these insufficient arguments, Shivers provides no facts from which the court could reasonably infer that her protected activity was the reason she was terminated. Her retaliation claim therefore fails.

IV.

For the foregoing reasons, we affirm.